## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

DANA RUSSELL COLLINS      \*
     \*
       v.      \*      Case No. WDQ-09-2663
     \*
JOHN S. WOLFE, WARDEN, et al.      \*

       .     \*\*\*\*\*\*

### MEMORANDUM

Pending is Dana Russell Collins's[1] petition for writ of habeas corpus under 28 U.S.C. §

2254, challenging his convictions in the Circuit Court for St. Mary's County, Maryland. No

evidentiary hearing is necessary. *See* Local Rule 105.6 (Md. 2011). For the following reasons,

the petition will be denied.

### I.    Background

From September 9, 2003 to September 17, 2003, Collins was tried by a jury; he was

found guilty of first- and second-degree murder. The Court of Special Appeals summarized the

evidence:

> In 1995, appellant was a Lieutenant in the United States Navy. He was stationed
> in St. Mary's County, Maryland. The murder victim, Jerry Culbreath, was also in
> the Navy. On November 2, `1995, Culbreath was reported missing. Appellant
> became an immediate suspect in Culbreath's disappearance because Culbreath
> had been having an affair with appellant's estranged wife, and appellant was
> aware of the relationship. Moreover, on the day prior to Culbreath's
> disappearance, appellant warned his estranged wife that "her friend [Mr.
> Culbreath] will be taken care of."
>
> On November 16, 1995, after being apprised of his *Miranda* rights by a St.
> Mary's County sheriff's deputy, appellant admitted killing Culbreath but said he
> did so in self-defense. His version of events, as told to a deputy sheriff, was as
> follows:

---

[1] Collins is confined at the Jessup Correctional Institution. Warden John S. Wolfe is his custodian.

[I] asked him [Culbreath] could he come out for a minute, could I talk to him. He said for what. I said uh, about me and my wife and he said hold on. He went back in the house and got, a small jacket on and he came back out and um 'I was standing in the parking lot and I was proceeding to go over to my car, and uh because I wanted him to get away from his house. Um, I told him that me and my wife was gonna reconcile and get back together and I didn't want him to still be in our lives but if he would please leave us alone and just let me raise my family and kids the way I want to and wanted to retire and take care of my family, and that he was an obstacle in the way. And um, he got upset and he told me why she wants me she doesn't want you. She comes to me every night and, um I just, I said well look, she's coming home Monday and that's all I have to say. Um, I proceeded to turn around and get in my car. He grabbed me by my shoulder and said nigger you ain't going nowhere. And I turned around and I swung at him, and um, hitting, striking him in the face, and he tried to return his uh, uh, swing and he missed because I ducked down under him when, underneath his arm, went up behind him, grabbed him by his neck, put my forearm around his neck, and commenced to choke him. And, uh, while choking him I broke his neck. And uh he fell on the ground and went limp. And uh I left him laying by, by his car. Um, after I returned home I thought about um people are gonna know I did it because my handprints are all over the place and um I took a knife and I uh went, proceeded to go back down to his home and he, was still laying there and I wanted to make it look like somebody had uh, uh carjacked him or, and moved his car so I poked him in the back of the uh, back a few times. I had blood drip, get on the ground and everything and I put the top of him in a, a plastic bag and I put him in my trunk and I drove down to Spring Ridge Middle School. I put him in the dumpster. I left from there.

Appellant also confessed to dismembering Culbreath's body before placing it in the dumpster. Parts of Culbreath's body were found in the St. Mary's County landfill on November 8, 1995.

The state introduced strong evidence to contradict appellant's claim that he broke Culbreath's neck in self-defense. For example, at the naval base where Collins worked, a note was found by one of Collins's colleagues shortly after Culbreath's disappearance. The note contained a "to-do" list with various items crossed out. The crossed-out items, all of which were accomplished, read "take him out, put him in my truck, wash blood away, drive his car to a complex close to entrance, run back, change clothes at work." Appellant admitted to the police that he authored the "to-do" list.

The state also introduced evidence that appellant purchased a crossbow and a package of bolts with arrows on the day before the victim disappeared. Dr. James Locke, a forensic pathologist who performed Culbreath's autopsy, testified that a three-prong arrowhead was found buried in the victim's backbone. According to Dr. Locke, the path of the arrowhead indicated that it would have severed several arteries and veins of the victim. In Dr. Locke's opinion, Culbreath's death was most likely caused by the puncture from the arrowhead and a stab wound in his back. No medical testimony corroborated appellant's statement that the victim's neck had been broken.

The State's theory of the case was that appellant laid in wait for Mr. Culbreath, shot the victim with a cross-bow, stabbed the victim to make the murder appear to be part of a carjacking, took the victim's body, and then put it in a dumpster.

The defense put on an imperfect self-defense case, based mainly on the testimony of Dr. Michael Spodak, a psychiatrist who testified at great length concerning appellant's mental condition during the time period leading up to the November 1995 killing. He testified that, since appellant enlisted in the Navy in 1978, he had an "exemplary performance record" through 1994. But, according to Dr. Spodak, "toward the latter part of the summer, around August [1995], things started really falling apart." In September 1995, appellant was hospitalized due to a suicide attempt. Psychological tests performed at that time indicated the onset of depression had occurred in August of 1995, and that "a general pattern of excitability and over-activity and personal setbacks" were affecting appellant's ability to control his "aggressive impulses." Dr. Spodak testified that tests conducted three weeks after appellant's suicide attempt indicated that appellant was "having an adjustment disorder with mixed emotional disturbance, emotional conduct with anger impulsivity, a personality disorder, and was functioning with what they call global assessment of 65." Dr. Spodak testified that appellant was discharged after his suicide attempt, only to be readmitted two days later after his wife left home. At that time, appellant "was functioning with global assessment 45," which meant that he had "serious symptoms and serious impairment from social occupation or other function." Dr. Spodak testified that, during this period of time, appellant complained that he was losing the Navy and his family. According to Dr. Spodak, appellant could not "differentiate between assertive and aggressive communication." Moreover, Dr. Spodak testified that appellant was suffering from fear of closed spaces and breathing problems that were related to traumatic events from his earlier Navy search and rescue training. Further, appellant kept to a bizarre diet of eating tuna fish exclusively, and constantly took Sudafed, all the while suffering from sleeplessness. Finally, appellant was never prescribed any medication during this time period.

Dr. Spodak concluded that appellant suffered from "an impaired ability to think, an impaired ability to concentrate, [and] an impaired ability to make decisions." Dr. Spodak summarized his conclusion by stating that appellant suffered impaired "executive function." The State called Dr. Jeffrey Janofsky in rebuttal, who

contradicted Dr. Spodak, stating "that there was no evidence whatsoever of any impairment in reality testing, [or] executive functioning around the time of the offense."

Exh. 11 at 1-6 (footnotes omitted).[2]  On February 12, 2004, Collins was sentenced to serve life in

prison without the possibility of parole.  Exh. 8 at 33.

On direct appeal, Collins raised four issues:

(1) Did the trial court err by admitting a letter written by Collins to his wife two years before the victim's death?

(2) Did the trial court err by allowing Dr. Janofsky to testify that appellant "laid in wait," "deliberated," and "preplanned" in the day prior to the victim's death?

(3) Did the trial court err in limiting follow-up questioning of prospective jurors regarding their admitted association with the State's Attorney?

(4) Did the trial court err by sustaining the State's objection to Collins's introduction of demonstrative evidence during the "not criminally responsible" phase of the trial?

---

[2] Although not quoted in the Court of Special Appeals's opinion, the to-do list referenced in the opinion reads as follows:

Tomorrow plan (recon)
1.   Find out time of his departure from home.  6:19
Notice all activity in entire area
Thursday Plans
1.   Take him out (crossed out)
2.   Put him in my trunk!  Wash blood away (crossed out)
3.   Later drive his car to complex close to entrance (crossed out)
4.   Run back to get my car and go to work
5.   Change clothes at work
Thursday night plans
1.   Cut him up/take head, fingers, and toes
2.   Put him in 2 bags
3.   Drive his car to D.C.
4.   get cab back
Saturday
1.   Drive body to Pennsylvania
Keep head + fingers + toes
Scatter on way back

Exh. 17 at 8 (*citing* Trial on the Merits Tr. at 5-158 - 5-165).

Exh. 9 at 2. The Court of Special Appeals affirmed Collins's convictions. On appeal to the Court of Appeals, Collins asked for further review of the voir dire issue, which was denied on December 21, 2005. Exh. 12 & 13.

On January 23, 2006, Collins filed a petition for post-conviction relief in the Circuit Court for St. Mary's County. That original petition was withdrawn without prejudice following a brief hearing on April 13, 2007, and a second petition for post-conviction relief was filed on August 10, 2007, claiming:

(1) The prosecutor committed misconduct by switching physical evidence; and

(2) Trial counsel was ineffective for failing to discover or object to the prosecution switching physical evidence.

*See* Exh. 14-17.

At the post-conviction hearing on January 11, 2008, five witnesses testified, including David Densford (lead trial counsel for Mr. Collins), Mr. Collins, Mark A. Porter (police detective), John D. Horne (chief investigator), and Joan Williams (court clerk). Exh. 16. On February 28, 2008, the court denied post-conviction relief. Exh. 17.

Collins sought leave to appeal the denial of post-conviction relief. Exh. 18. On May 13, 2009, the Court of Special Appeals summarily denied leave to appeal. Exh. 19.

## II.   Analysis

### A.   Standard of Review

The federal habeas statute, 28 U.S.C. § 2254, provides a "highly deferential standard for evaluating state-court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333 n. 7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005).[3] Ineffective assistance claims are reviewed under a two-part test

---

[3] A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a

established in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Bell v. Cone*, 535 U.S. 695,

698-99 (2002) (explaining the interplay between *Strickland* and 28 U.S.C. § 2254(d)).[4]

### B.    Collins's Claims

Here, Collins claims: (1) the trial court erred when it denied him the right to question

potential jurors concerning "their admitted prior association with the State's Attorney;" (2) the

State committed prosecutorial misconduct by switching physical evidence prior to trial; and (3)

trial counsel provided ineffective assistance by failing to discover and disclose to the trial judge

the evidentiary switch.

---

decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"[A] federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." *Renico v. Lett*, ___ U.S. ___, 130 S.Ct. 1855, 1862 (2010). The state court's application of Supreme Court precedent must be "objectively unreasonable." *Id.* This "highly deferential standard . . . demands that state-court decisions be given the benefit of the doubt." *Id.* A state court's factual determination is unreasonable under § 2254(d)(2) when it is more than merely incorrect or erroneous. *Schriro v. Landrigan*, 550 U.S. 465, 474 (2006). It must be sufficiently against the weight of the evidence that it is objectively unreasonable.   "[F]ederal habeas courts [have] no license to redetermine credibility of witnesses[.]" *Marshall v. Lonberger*, 459 U.S. 422 (1983); *see also Cagle v. Branker*, 520 F.3d 320,324 (4th Cir. 2008).

[4] To establish ineffective assistance of counsel, it must be shown that counsel's deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. Representation is deficient if it falls below "an objective standard of reasonableness." *Id.* at 688. Counsel's performance must have been outside "the range of competence demanded of attorneys in criminal cases." *Id.* at 687 (citation and internal quotation marks omitted). The review of competence is "highly deferential" with a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner must overcome the presumption that the challenged action was "sound trial strategy." *Id.*

Prejudice requires that (1) counsel's errors deprived the defendant of a fair trial whose result is reliable, and (2) it is probable that, but for counsel's errors, the result would have been different. *See id.* at 690-94. A determination need not be made concerning the attorney's performance if it is clear that no prejudice would have resulted had the attorney been deficient. *See id.* at 697. A petitioner must show that the state court applied *Strickland* to the facts in an objectively unreasonable manner. *See Bell*, 535 U.S. at 698-99; *Williams*, 529 U.S. at 405.

### 1.   Voir Dire

At trial, the court asked the prospective jurors if anyone was related by blood or marriage

to either of the attorneys, and received no response. Exh. 2 at 18. The trial court then asked,

"Does anyone know either of the attorneys [referring to counsel for the prosecution and counsel

for the defendant] from any professional, business or social relationship?" Exh. 2 at 18. Ten

members of the venire responded in the affirmative. The trial court further asked those ten,

"With respect to all the persons who answered in the affirmative to that last question, are there

any among you who would be unable to render a fair and impartial verdict in this case? If so,

please rise or raise your hand." Exh. 2 at 20. No prospective jurors responded. The trial court's

next question was whether either of the attorneys had represented any prospective jurors in a

legal matter. One member of the venire, who had also responded in the affirmative to the

professional/business/social relationship question, responded in the affirmative. Exh. 2 at 20.

That prospective juror stated that he could act with impartiality. Exh. 2 at 20. At the conclusion

of voir dire, Collins's attorney stated:

> In Question No. 3, the defense would request that any of the jurors be
> asked what the nature of knowing counsel, [the Prosecutor], or myself is.
> I don't recognize most of these people. We've already learned that one of
> these fellas who was stricken is a goose hunter with [the Prosecutor]. I
> would like to know the nature so either I can move to strike them for cause
> or use of a peremptory . . . I would like to have a follow-up of what the
> nature of their relationship with [the Prosecutor] is. You want to rule on
> that one?

Exh. 2 at 52-53. The Court denied the request for follow-up voir dire. Exh. 2 at 53.

The clearly established federal right at issue is the Sixth Amendment guarantee of the

right to trial "by an impartial jury," which is applicable to state courts via the Fourteenth

Amendment. U.S. Const. amend VI; *see Irvin v. Dowd*, 366 U.S. 717, 721-22 (1961) (holding

that the Fourteenth Amendment requires that States guarantee a fair trial by a panel of impartial

jurors). Collins's challenge to the voir dire process is somewhat limited. It does not involve an allegation of potential taint to the entire venire and, notably, does not include any allegation that any juror who served on the panel was actually biased. Of the ten jurors who originally responded in the affirmative to the voir dire question about a professional, business, or social relationship with counsel, four were stricken for cause on other grounds or for hardship. Exh. 2 at 28, 29, 31. One was the subject of a peremptory challenge by government counsel. Exh. 2 at 59. Three others were not considered until the alternate pool and were therefore ineligible for participation in deliberating or rendering the verdict. Exh. 2 at 65-68. As a result, only two members of the venire for the petit jury answered in the affirmative to the question about a professional/business/social relationship with counsel. The defense had twenty peremptory challenges to use, and therefore could have opted to strike both jurors using only a small percentage of its total allotted peremptory challenges. The defense, in fact, did strike one of the two, and only one of the prospective jurors who responded affirmatively to the question about a relationship with counsel, Juror 169, was part of the panel that deliberated and rendered the verdict. Exh. 2 at 56, 63. The record does not reflect whether, in fact, Juror 169 had a professional, business, or social relationship with the prosecutor or the defense attorney. Clearly, however, the defense attorney did not reserve a peremptory challenge for Juror 169.

In this case, the Court of Special Appeals considered the issue as follows:

> Appellant contends that the trial judge erred when he refused to ask the requested follow-up question. We note at the outset that the trial court's earlier question, "Does anyone know either of the attorneys from any professional, business, or social relationship?" was inclusive of appellant's requested follow-up question concerning "the nature of their relationship with [the prosecutor]." From the answer already given, counsel knew that the relationship was either "professional," "business," or "social." Therefore, appellant's requested question, if it had been asked, would have been partially redundant.

> In any event, the overriding principle of voir dire is "to ascertain the existence of cause for disqualification." *Hill v. State*, 339 Md. 275, 279 (1998) (citations omitted). The

purpose is not to educate counsel so that he or she may more intelligently exercise peremptory challenges.  One area of inquiry that can be fruitful in discovering actual cause for disqualification involves inquiry designed to discover "the state of mind of the juror in respect to the matter at hand or any collateral matter reasonably liable to unduly influence him."  *State v. Thomas*, 369 Md. 202, 207 (2002); *accord, Dingle v. State*, 361 Md. 1, 9-10 (2000); *Davis v. State*, 333 Md. 27, 35-36 (1993).  As the Court of Appeals said in *Thomas,*

> Undergirding the voir dire procedure and, hence, informing the trial court's exercise of discretion regarding the conduct of the voir dire, is a single primary and overriding principle or purpose: "to ascertain the existence of cause for disqualification."

369 Md. at 207 (quoting *Hill*, 339 Md. at 279 (1998)).  Ascertaining the existence of cause for disqualification is important because

> "[I]f a prospective juror is 'unable to apply the law' or 'holds a particular belief . . . that would affect his ability or disposition to consider the evidence fairly and impartially,' he 'should be excused for cause.'"

*Baker v. State*, 157 Md. App. 600, 611 (2004) (quoting *Forster v. State*, 304 Md. 439, 454 (1988)).

In this case, if each juror had revealed "the nature" of his/her relationship with the prosecutor, that response would not have elicited a "cause for disqualification" because each of the jurors had previously advised the court that their relationships with the prosecutor and/or the defense attorney would not prevent them from rendering a fair and impartial verdict in the case at hand.  Moreover, an answer to the proposed question would not have informed counsel as to whether the prospective juror's relationship with counsel rendered him or her unable to apply the law or hold a particular belief that would affect his or her ability or disposition to consider the evidence fairly and impartially. Accordingly, the trial court did not abuse its discretion by denying appellant's proposed follow-up question.

Exh. 11 at 20-22.

Although the trial court's voir dire examination was not a model of thoroughness, under the highly deferential standard applicable where a federal habeas court is reviewing a state court proceeding, it cannot be said that the state court's application of federal law was objectively unreasonable.  Supreme Court law requires that the trial judge determine whether a possible source of bias would be prejudicial to a juror's impartial consideration of a case, such that the

prospective juror should be stricken for cause. *See Remmer v. United States*, 347 U.S. 227, 230, 74 S.Ct. 450, 98 L.Ed.654 (1954). "Challenges for cause are typically limited to situations where actual bias is shown." *Person v. Miller*, 854 F.2d 656, 664 (4th Cir. 1988) (*citing United States v. Loucas*, 629 F.2d 989, 992 (4th Cir. 1980)). In this case, the post-conviction court essentially found that actual bias was ruled out by the trial court's inquiry as to whether the prospective jurors could evaluate the case impartially. Moreover, because the relationship between the prospective jurors was not one of a familial relationship but was only a professional, business, or social relationship, actual bias could not have been established simply by inquiring further about the nature of that relationship. At best, the inquiry would have provided more information for counsel to use in evaluating whether to use a peremptory challenge, which is not the proper role of voir dire.

Ultimately, the deference afforded to state courts in federal habeas review restricts the purview of this court to the issue of whether the voir dire was constitutionally defective. *See Mu'Min v. Virginia*, 500 U.S. 415, 422 (1991) (noting that the Supreme Court had supervisory power over voir dire in federal courts but, with respect to state court trials, had authority only to enforce the commands of the United States Constitution). That high standard has not been met in this case. In holding that an inquiry into racial bias was not constitutionally required in a state court case involving a white victim and an African-American defendant, the Supreme Court stated:

> The Constitution does not always entitle a defendant to have questions posed during voir dire specifically directed to matters that conceivably might prejudice veniremen against him. *Ham, supra*, 409 U.S., at 527-528, 93 S.Ct., at 850. Voir dire "is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion." *Connors v. United States*, 158 U.S. 408, 413, 15 S.Ct. 951, 953, 39 L.Ed. 1033 (1895); *see Ham, supra*, 409 U.S. at 527-528. This is so because the "determination of impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge." *Rideau v. Louisiana*, 373 U.S. 723, 733, 83 S.Ct. 1417, 1423,

10 L.Ed.2d 663 (1963) (Clark, J., dissenting). Thus, the State's obligation to the defendant to impanel an impartial jury generally can be satisfied by less than an inquiry into a specific prejudice feared by the defendant. *Ham, supra*, 409 U.S., at 527-528, 93 S.Ct., at 850.

*Ristiano v. Ross*, 424 U.S. 589, 597-98 (1976). That same analysis is applicable in this case. Because "[a] trial court's findings of juror impartiality may 'be overturned only for 'manifest error,''" the state court's decision in this case withstands constitutional scrutiny. *Mu'Min*, 500 U.S. at 429 *(quoting Patton v. Yount,* 467 U.S. 1025, 1031, 104 S.Ct. 2885, 2889, 81 L.Ed.2d 847 (1984)).

## 2.    Prosecutorial Misconduct

Collins contends that the prosecutor engaged in misconduct because bow string evidence was allegedly switched. Specifically, he contends that the bow strings presented as an exhibit at his trial were not the strings that were seized from his truck. Exh. 16. Collins's attorney did not question the witness who testified about the bow strings at trial about the authenticity of the strings. Exh. 2 at 134. Also, Collins's attorney did not object to the admission of the bow strings at trial. Exh. 2 at 212. Collins contends also that the bow strings produced at the April 13, 2007 post-conviction hearing were the actual strings that were seized from his truck, and that the "switching back" of the bow strings constitutes further prosecutorial misconduct. Exh. 16. Finally, Collins contends that the bow strings produced at his final post-conviction hearing on January 11, 2008 were a new set of bow strings he had never seen before. Exh. 16 at 33. In other words, Collins contends that the bow strings were switched for a third time, as the bow strings in January of 2008 were neither the ones he had purchased, which allegedly were present at the April 2007 hearing, nor the ones that were offered at his trial.

Collins contends that, if the real bow strings had been put into evidence at trial, the State would have had a harder time convincing the jury that the murder was premeditated, because the

evidence would have demonstrated that the victim was stabbed with the arrow during a fight and not shot with the crossbow. Collins therefore contends that the prosecutorial misconduct in allegedly switching the strings violated his right to due process.

The Circuit Court for St. Mary's County, on post-conviction, heard testimonial evidence from witnesses including the seizing detective, the chief investigator charged with maintaining the integrity of the evidence, and the court clerk in charge at the time of criminal cases. Exh. 16. The post-conviction court then found as follows:

> Even if Petitioner's claims are valid (and there is no evidence that they are), the jury was presented with Petitioner's evidence of his claim that he stabbed the victim with the bolt rather than shooting him. Petitioner testified that there was only one string with the crossbow and that he did not know where the string with the notches came from. Trial on the Merits Tr. at 5-130-131 (Sept. 16, 2003). Petitioner also stated that he did not put a bolt up to the string. Trial on the Merits Tr. at 5-131 (Sept. 16, 2003). Petitioner further stated that he stabbed the victim in the neck with the bolt. Trial on the Merits Tr. At 5-134 and 5-170 (Sept. 16, 2003). In addition, trial counsel argued to the jury that Petitioner's actions were not planned. During closing arguments, Petitioner's defense counsel stated:
>
>> There is a fight. What do we know to a particular certainty? We know that Dana did not lie in wait somewhere, stay back there, fire this bolt and kill this man by shooting him in the neck, and then go up there, because there wouldn't be defensive wounds.
>
> Trial on the Merits Tr. at 3-140 (Sept. 11, 2003). The jury was presented with Petitioner's theory of the crime and was able to determine whether they found his version of the events credible.
>
> On the other hand, the jury was presented with significant additional evidence to support premeditation; e.g., the fact that Petitioner had a chainsaw in his car and had written a "how-to-kill" note. . . . All of this other evidence was more than sufficient for the jury to find premeditation. Thus, any error made was harmless, not prejudicial, and did not affect the outcome of the trial.

Exh. 17 at 7-8.

The post-conviction court's determination withstands scrutiny. The post-conviction court, after an evidentiary hearing, found no evidence of prosecutorial misconduct. Further, the

post-conviction court determined that any if any error were made, it was harmless in light of the other significant evidence of premeditation.  As a result, there was no prosecutorial misconduct that "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).

### 3.   Ineffective Assistance of Counsel

Collins contends that his trial counsel was ineffective for failing "to discover and complain about the evidentiary switch."  Petition at 6.   Reviewing the ineffective assistance claim under *Strickland*, the post-conviction court found trial counsel's performance reasonable. Exh. 17 at 10-12.  First, the post-conviction court noted, "Petitioner has provided no reasonable proof that any evidence was switched."  Ex. 17 at 11.  Second, however, the post-conviction court noted that even if Petitioner had proved an evidentiary switch and his trial counsel committed a deficient act, "the admission of the bow-string evidence did not prejudice the petitioner" because other evidence at trial, including Petitioner's procurement of the cross-bow, the saw in his car, and the to-do note, was amply sufficient to show premeditation. Ex. 17 at 11.

The decision of the state post-conviction court is supported in the record and constitutes a reasonable application of Supreme Court precedent to the facts.  The jury considered Collins's testimony about premeditation, and the defense at trial focused on the issue of premeditation.   In light of the significant additional evidence of premeditation, completely unrelated to bow strings, any possible deficiencies in counsel's performance with respect to the switching of bow strings cannot be deemed prejudicial.  The determination of the state court is entitled to deference and will not be disturbed.

### C.   Certificate of Appealability

The court finds that Collins is not entitled to a certificate of appealability ("COA"). A prisoner seeking a motion to vacate has no absolute entitlement to appeal a district court's denial of his motion. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a COA. *Id.* "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). To make such a showing, the defendant "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000)) or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 335-36, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983). When a district court dismisses a habeas petition solely on procedural grounds, a COA will not issue unless the petitioner can demonstrate both "(1) that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right' and (2) 'that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" *Rose v. Lee*, 252 F.3d 676, 684 (4th Cir. 2001) (quoting *Slack*, 529 U.S. at 484). Petitioner has not made the requisite showing in these circumstances. Denial of a COA does not prevent petitioner from seeking permission to file a successive petition or pursuing his claims upon receipt of such permission.

**III.   Conclusion**

For the reasons stated herein, Collins's petition will be denied.

Dated: _9/21/11_

_____
William D. Quarles, Jr.
United States District Judge